UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-1566
(11-0624)

MARINE   REPAIR   SERVICES,   INCORPORATED;   SIGNAL   MUTUAL
INDEMNITY ASSOCIATION, LIMITED,

              Petitioners,

         v.

CHRISTOPHER   E.   FIFER;   DIRECTOR,   OFFICE   OF   WORKERS'
COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR,

              Respondents.

O R D E R

    Upon  Petitioners'  motion  for  publication  of  the  Court's
opinion,

    IT IS ORDERED that the motion to publish is granted.

    The Court amends its opinion filed May 2, 2013, as follows:

    On  the  cover  sheet,  section  1  --  the  status  is  changed  from
"UNPUBLISHED" to "PUBLISHED."

    On  the  cover  sheet,  section  6  --  the  status  line  is  changed
to read "Vacated and remanded by published opinion."

On the cover sheet -- the reference to the use of unpublished opinions as precedent is deleted.

For the Court – By Direction


/s/ Patricia S. Connor
Clerk

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-1566**

MARINE REPAIR SERVICES, INCORPORATED; SIGNAL MUTUAL
INDEMNITY ASSOCIATION, LIMITED,

      Petitioners,

     v.

CHRISTOPHER E. FIFER; DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR,

      Respondents.

On Petition for Review of an Order of the Benefits Review Board.
(11-0624)

Argued: March 20, 2013          Decided: May 2, 2013

Before WILKINSON, SHEDD, and DUNCAN, Circuit Judges.

Vacated and remanded by published opinion. Judge Duncan wrote
the opinion, in which Judge Wilkinson and Judge Shedd joined.

Lawrence Philip Postol, SEYFARTH SHAW, LLP, Washington, D.C.,
for Petitioners. Michael J. Perticone, HARDWICK & HARRIS,
Baltimore, Maryland, for Respondents.

DUNCAN, Circuit Judge:

Marine Repair Services, Inc. ("Marine") petitions for review of the Decision and Order of the Benefits Review Board ("BRB" or the "Board") awarding permanent partial disability benefits to Marine's former employee, Christopher Fifer, under the Longshore and Harbor Workers' Compensation Act ("LHWCA"). Applying the burden-shifting scheme that governs LHWCA disability claims, the administrative law judge ("ALJ") reviewing Fifer's claim concluded that Marine failed to meet its burden of presenting suitable alternative employment for Fifer. The BRB affirmed. Because the ALJ made findings unsupported by the record and demanded more of Marine than our precedent requires, we grant Marine's petition for review, vacate the Decision and Order of the BRB, and remand for further proceedings consistent with this opinion.

I.

A.

Prior to the events underlying this petition, Fifer earned $1,219 weekly working for Marine as a repairman of large shipping containers, a physically demanding job requiring climbing, bending, and heavy lifting of over fifty pounds. On October 26, 2007, Fifer suffered shoulder, arm, and back injuries in an on-the-job car accident. After the accident,

2

Marine began paying Fifer temporary total disability benefits while Fifer sought treatment.

Dr. Michael Franchetti became Fifer's primary orthopedist, to whom Fifer complained of back pain which radiated down his legs, as well as back spasms. During his two-year course of treatment, Dr. Franchetti encouraged Fifer to perform physical therapy, prescribed muscle relaxers and painkillers, and reviewed scans of Fifer's spine. He also referred Fifer to another physician for epidural steroid injections. Dr. Franchetti ultimately diagnosed Fifer with chronic lumbosacral strain, sciatica, and disc protrusion and herniation.

Fifer underwent his first functional capacity evaluation ("FCE") in June 2008. In addition to finding that Fifer did "not meet the physical demands of his pre-injury occupation," the evaluator concluded that Fifer should limit himself to jobs within "medium" work parameters, and that he should limit lifting to twenty-five pounds on an occasional basis. J.A. 241. In an attempt to prepare himself to return to Marine, Fifer completed a round of work-hardening from July to September 2008.[1] The work-hardening evaluator released Fifer on September 12,

---

[1] Work-hardening is a rehabilitation process through which injured employees perform tasks that simulate the physical demands of their jobs in an effort to condition them for return to employment.

3

2008, ascribing him "full time tolerance[] with the lower parameters of heavy work, with limitations in bending and material handling." Id. at 263 (the "2008 work-hardening release"). The evaluator instructed Fifer to see Dr. Franchetti on September 15, 2008 for "a full release back to work." Id.

Fifer's September 15 visit to Dr. Franchetti resulted in updated work restrictions (the "September 2008 restrictions"). Dr. Franchetti indicated that Fifer could return "to restricted work status," so long as he performed "[n]o repetitive bending or twisting with [his] back, no lifting more than 55 lbs., no carrying more than 40 lbs., no overhead lifting more than 30 lbs., no lifting more than 30 lbs. frequently, and no sitting more than 45 minutes without changing positions." J.A. 211. Marine would not employ Fifer while he was subject to the September 2008 restrictions. As a result, Fifer began working at his family's seafood restaurant, where he earned $400 weekly performing odd jobs, errands, and assisting with food preparation. Prior to his work as a longshoreman, Fifer had managed his family's restaurant for two years.

Both parties agree that Fifer reached maximum medical improvement in February 2009. On August 20, 2009, Fifer underwent a second FCE. That evaluation showed reduced lifting ability, as compared to the 2008 FCE, but also indicated that Fifer could sit and stand "frequent[ly]" and walk "const[antly]"

4

at a slow pace, improvements from the 2008 FCE. J.A. 371. The evaluator concluded that work in the family restaurant was "consistent with [Fifer's] demonstrated activity tolerances," that Fifer could not return to Marine as a container repairman, and that he should "[m]aintain work activity within the light work parameters." Id. at 373. According to the FCE, "light work" includes jobs that involve occasionally lifting up to twenty pounds and require "walking or standing to a significant degree." Id. at 371.

During an October 2009 deposition in connection with this case, Dr. Franchetti clarified that based on the results of the August 2009 FCE, he would revise his September 2008 restrictions. Specifically, based on the August 2009 FCE, Dr. Franchetti would reduce Fifer's "lifting and carrying weight to 25 pounds," reduce overhead lifting to twenty pounds, and "would recommend no lifting more than about 10 to 15 pounds frequently." J.A. 390 ("the October 2009 restrictions"). Fifer's sitting restriction remained the same: no sitting without changing position for forty-five or more minutes. Dr. Franchetti confirmed that he did not see any problem with Fifer's work in the family restaurant.

B.

1.

After Marine discontinued temporary payments in January 2009, Fifer filed this claim for permanent disability benefits under the LHWCA, 33 U.S.C. § 901 et seq. The ALJ conducted a hearing on October 29, 2009.

At the hearing, Fifer and Dr. Franchetti testified that physical limitations prevented Fifer from returning to work as a repairman at Marine.[2] Dr. Franchetti testified that Fifer "has sustained a permanent impairment to his person as a whole, as a result of his lumbar spinal injury," resulting in a "31 percent whole person impairment." J.A. 389.

Marine presented evidence of alternative employment for Fifer in the relevant geographic area. Marine's vocational rehabilitation specialist, Brian Sappington, testified to three labor market studies he had prepared to demonstrate alternative employment. The first two were conducted in December 2008 and relied on Fifer's 2008 work-hardening release, which allowed "[h]eavy duty [work] with limitations." J.A. 276. The first study listed positions as a welder, forklift driver, courier, and security guard; the second included five restaurant management positions with "light duty" physical requirements.

_____

[2] Dr. Franchetti testified by deposition.

Sappington's third and final study took Dr. Franchetti's September 2008 restrictions into account. J.A. 359 (noting that Fifer's restrictions were "[u]nlimited standing with restricted lifting per Dr. Franchetti"). That study provided a description of the restaurant manager and assistant manager role from the Dictionary of Occupational Titles ("DOT") and listed six restaurant management positions for which Sappington testified Fifer would be vocationally qualified.

Sappington supplemented the second and third study with his testimony at the hearing before the ALJ. Specifically, upon receiving Dr. Franchetti's October 2009 work restrictions, Sappington had contacted employers from the second and third studies and performed site visits to determine whether the restaurant management positions would comport with Fifer's revised lifting restrictions. Sappington testified that he identified two restaurants where a person with a twenty-five pound lifting restriction "would be a candidate" or where "the restaurant would provide reasonable accommodation to someone with Mr. Fifer's background and restrictions," J.A. 156, and two more restaurant positions where employees told Sappington they rarely lifted anything over twenty-five pounds and felt accommodations were possible, id. at 157-58, even though the job descriptions for those restaurant posts required an ability to lift more than twenty-five pounds. Sappington identified three

7

additional restaurant positions which did not include a minimum lifting requirement, although he was unable to verify actual lifting requirements at those restaurants. Therefore, Sappington concluded that of the seven restaurants he visited, four of them would "definite[ly]" accommodate Fifer's physical limitations. Id. at 164. The annual salary for these positions ranged from $28,000 to $40,000. Sappington also testified that the security guard positions listed in the first labor market study, which required "frequent standing and walking," fit within Dr. Franchetti's October 2009 restrictions. J.A. 282.

2.

In an opinion issued on March 28, 2010, the ALJ concluded that Fifer met his burden of establishing a prima facie case of total disability since he could not return to his former position at Marine. The ALJ then assessed whether Marine had rebutted Fifer's showing of disability by demonstrating the availability of suitable alternative employment by comparing Sappington's labor market studies with Fifer's vocational and physical abilities. She found that none of Sappington's studies provided adequate levels of detail regarding the positions' requirements. As such, the ALJ determined that Fifer's job in the family restaurant, where he earns $20,800 annually, represented his wage earning capacity. She awarded permanent partial disability benefits accordingly.

8

The ALJ credited Fifer's testimony regarding his physical limitations. Fifer testified that he chose to work at his family's restaurant because there, "if I need to take a break and sit down I can sit down and . . . I'm not going to get fired." J.A. 96. While Fifer testified that he can "do everything [at the restaurant] that needs to be done," he has, on at least one occasion, taken a thirty minute break to lay down when he felt a muscle spasm developing in his back. J.A. 96-97. The ALJ also credited the testimony of Fifer's brother, Tracy, who manages the restaurant; Tracy Fifer testified that his brother "has up days and down days" and sometimes "needs to sit down right away" when he arrives to work. J.A. 129. The ALJ also credited the deposition testimony of Dr. Franchetti, who confirmed that Fifer's restaurant work comported with the October 2009 restrictions, which limited Fifer to lifting a maximum of twenty-five pounds.

In rejecting the labor market studies, the ALJ found Marine's first study inconsistent with Fifer's restrictions, as some of the jobs--forklift operator and welder--"require[d] the ability to perform medium or heavy work." Id. at 32. The ALJ rejected the security officer positions listed in the first study after finding that Fifer's pain medication regimen would cause him to fail any required drug screenings, precluding employment as a security guard. The ALJ rejected the five light

9

duty restaurant management positions in Marine's second study because "Mr. Sappington did not provide a description of the positions, other than by their title," nor did he indicate that he "actually spoke to anyone about the job duties and availability of these positions." Id. Finally, although the ALJ recognized that the third study, along with Sappington's testimony, identified four positions where "lifting over 25 pounds was not regularly required of the manager," she faulted that study for failing to "describe[] the specific duties of these positions, in particular, whether they require standing for long periods of time, and provide for rest breaks." Id. at 33. The ALJ concluded that "Mr. Fifer's credible complaints of pain, his inability to stand for long periods of time, his need for frequent rest breaks, and his regimen of medication" made the restaurant jobs inapplicable "although [the jobs] may accommodate the lifting restrictions." Id.

The Board affirmed the ALJ's decision. It concluded that Sappington "did not provide all of the job duties or assess the jobs' suitability in terms of all of claimant's restrictions," and "did not refer to any standard job descriptions." Id. at 59. Because Sappington's reports "lack[ed] . . . specific information regarding all the physical duties required of the positions," the ALJ could not determine whether Fifer's need for

10

"frequent breaks" and "limit[ations] in the amount of sitting and standing he can do" would be accommodated. Id.

The Board issued its final opinion on April 5, 2012. This appeal followed.

## II.

On appeal, Marine contends that it met its burden of showing suitable alternative employment for Fifer, and that the ALJ's conclusions are therefore unsupported by substantial evidence.[3]

In determining whether Marine met its burden of showing suitable alternative employment, we review Board decisions for errors of law and "to ascertain whether the Board adhered to its statutorily mandated standard for reviewing the ALJ's factual findings." Newport News Shipbldg. & Dry Dock Co. v. Riley, 262 F.3d 227, 231 (4th Cir. 2001). An ALJ's factual findings "'shall be conclusive if supported by substantial evidence in the record considered as a whole.'" Newport News Shipbldg. & Dry Dock Co. v. Stallings, 250 F.3d 868, 871 (4th Cir. 2001) (quoting 33 U.S.C. § 921(b)(3)).

---

[3] Marine also raises several challenges related to Fifer's attorney's fee award. Attorney's fees are available for successful prosecution of a LHWCA claim. 33 U.S.C. § 928. Because we vacate the Board's Order and remand, we need not address the issue of attorney's fees.

11

Our assessment of whether the Board complied with that standard comprises "an independent review of the administrative record"; "[l]ike the Board, [we] will uphold the factual findings of the ALJ so long as they are supported by substantial evidence." Norfolk Shipbldg. & Drydock Corp. v. Faulk, 228 F.3d 378, 380 (4th Cir. 2000). We consider "substantial evidence" to require "more than a scintilla but less than a preponderance"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. at 380-81 (internal quotation and citation omitted). We review the ALJ's legal determinations de novo. Dir., Office of Workers' Comp. Programs v. Newport News Shipbldg. & Dry Dock Co., 138 F.3d 134, 141 (4th Cir. 1998).

The Act provides compensation to longshore workers who have experienced on-the-job injuries "for the economic harm suffered as a result of the decreased ability to earn wages." Norfolk Shipbldg. & Drydock Corp. v. Hord, 193 F.3d 797, 800 (4th Cir. 1999). LHWCA claims are governed by a burden-shifting scheme; in order to make a successful compensation claim, "a claimant must first establish a prima facie case by demonstrating an inability to return to prior employment due to a work-related injury." Newport News Shipbldg. & Dry Dock Co. v. Dir., Office of Workers' Comp. Programs, 315 F.3d 286, 292 (4th Cir. 2002). "If the claimant makes this showing, 'the burden shifts to the

12

employer to demonstrate the availability of suitable alternative employment which the claimant is capable of performing.'" Id. (citation omitted). If the employer does not itself provide suitable alternative employment, it "'may demonstrate that [such] employment is available to the injured worker in the relevant labor market.'" Id. at 293 (citation omitted). If the employer meets this burden, "its obligation to pay disability benefits is either reduced or eliminated, unless the employee shows 'that he diligently but unsuccessfully sought appropriate employment.'" Id. (citation omitted).

As Fifer established disability by showing that he is unable to return to his job at Marine, this case turns on whether Marine has met its burden of showing suitable alternative employment. In particular, Marine contends that it offered evidence of alternative employment more lucrative than Fifer's position at his family's restaurant. A finding of higher-paying alternative employment would increase Fifer's wage-earning capacity and decrease or nullify the disability payments Marine owes Fifer.

We find the ALJ's conclusion that Marine failed to present suitable alternative employment erroneous for two reasons: (1) the ALJ made findings of fact as to Fifer's physical limitations which were unsupported by substantial evidence in the record, and (2), the ALJ faulted Marine for failing to address these

13

limitations, imposing a heavier legal burden than our precedent requires.

1.

First, in rejecting Marine's labor market studies, the ALJ emphasized Fifer's "inability to stand for long periods of time," "need for frequent rest breaks," and "regimen of medication," physical limitations unsupported by substantial evidence in the record. J.A. 33. Although we may not disregard the ALJ's findings "'on the basis that other inferences might have been more reasonable,'" Ceres Marine Terminals, Inc. v. Green, 656 F.3d 235, 240 (4th Cir. 2011) (citing Newport News Shipbldg. & Dry Dock Co. v. Tann, 841 F.2d 540, 543 (4th Cir. 1988)), there must be some evidence in the record to support the findings.

The ALJ's conclusions regarding Fifer's problems standing and need for breaks were unsupported by the evidence in the record. Fifer did not testify that he had trouble standing; instead, he indicated that he needed to take breaks during work-hardening in 2008 (while performing tasks targeted towards returning him to "hard" work parameters) and that he chose to return to his family's restaurant because he knew he could take breaks there without reprimand. On one occasion, he had to lay down to rest his back; his brother testified that sometimes Fifer "needs to sit down right away." Id. at 129. While the

14

ALJ credited Fifer's testimony, she also credited the testimony of Dr. Franchetti, who never mentioned standing restrictions or rest break requirements, either in his testimony or in the September 2008 or October 2009 work restrictions. In fact, Dr. Franchetti indicated that Fifer's physical limitations did not bar him from restaurant work. Further, the most recent FCE indicated that Fifer could stand "frequent[ly]" and walk "const[antly]" within light work parameters. J.A. 371.

The ALJ also emphasized Fifer's medication regimen as a barrier to employment, ultimately faulting Marine for failing to address Fifer's medication-related restrictions in its labor market studies. The ALJ indicated that the security guard positions Marine offered would likely require drug tests which Fifer would fail. Nothing in the record, however, indicated that Fifer's medications interfered with his ability to find work. There was no evidence to support the ALJ's conclusion that security guards routinely undergo drug testing, that prescription painkillers cause applicants to fail required drug tests, or that Fifer's regimen would bar Fifer from employment. The ALJ's determination that Fifer could not qualify for the security guard positions because of his medication was thus unsupported by any evidence, much less substantial evidence.

15

2.

Second, the ALJ's emphasis on Fifer's standing, rest break, and medication-related restrictions led her to fault Marine for overlooking them in its labor market studies. The ALJ thus penalized Marine for failing to address restrictions of which it was unaware, imposing too heavy a responsibility under the LHWCA's burden-shifting scheme. This was legal error, for which we vacate the underlying decision and order. See Universal Mar. Corp. v. Moore, 126 F.3d 256, 264-65 (4th Cir. 1997) (vacating the BRB's decision and remanding after holding that the ALJ's imposition of too great a burden on the employer to demonstrate suitable alternative employment was an error of law); Trans-State Dredging v. Benefits Review Board, 731 F.2d 199, 201 (4th Cir. 1984) (reversing the BRB and remanding after finding that requiring the employer to contact prospective employers to determine whether they would hire someone with the claimant's abilities "place[d] too heavy a burden upon the employer").

We have held that, to meet its burden, "an employer must present evidence that a range of jobs exists which is reasonably available and which the disabled employee is realistically able to secure and perform." Lentz v. Cottman Co., 852 F.2d 129, 131 (4th Cir. 1988). There must be "a reasonable likelihood, given the claimant's age, education, and vocational background that he would be hired if he diligently sought the job[s]" the employer

16

presents. Id. (quoting Trans-State Dredging, 731 F.2d at 201). Demonstrating a single job opening is not enough. Id. Once the employer has presented a range of appropriate jobs, however, "the employer need not contact prospective employers to inform them of the qualifications and limitations of the claimant and to determine if they would in fact consider hiring the candidate for their position." Universal Mar., 126 F.3d at 264. Nor must the employer "contact the prospective employers in his survey to obtain their specific job requirements before determining whether the claimant would be qualified for such work." Id. Rather, if the employer demonstrates "the availability of specific jobs in a local market," he may rely "on standard occupational descriptions to fill out the qualifications for performing such jobs." Id. at 265.

Marine relied on the physical restrictions of which it was aware to present a range of suitable positions for Fifer. Prior to the hearing, Dr. Franchetti never indicated a standing restriction or a rest break requirement; to the contrary, after giving his revised October 2009 restrictions, he indicated that "cooking, deliveries and takeout," as well as managerial work, would comport with Fifer's physical restrictions. J.A. 390. Marine relied on the restrictions it knew of to prepare labor market studies, updating those reports as it became aware of revised restrictions.

17

Marine cannot be faulted for failing to account for restrictions which were unannounced prior to the hearing, a conclusion underscored by the ALJ's unfounded findings with respect to Fifer's medication-related restrictions. While the record corroborated the fact that Fifer took medication to manage his pain, neither his nor his treating physician's testimony supports the conclusion that Fifer's medication interfered with his ability to obtain employment. Indeed, as discussed above, nothing in the record indicated that security guards must undergo drug tests to qualify for employment. Faulting Marine for failing to address unfounded restrictions turns the employer's showing of suitable alternative employment into a moving target.

Moreover, the ALJ overstated Marine's burden of presenting suitable alternative employment. The third labor study, at least, described with requisite specificity the responsibilities of a restaurant manager or assistant manager using the DOT. We have expressly approved the use of the DOT's "standard occupational descriptions to fill out the qualifications" of suitable alternative employment in LHWCA cases. Universal Mar., 126 F.3d at 265. In Universal Maritime, we explained that we sanction the use of the DOT's occupational descriptions because "the claimant is able to correct any overbreadth in a survey by demonstrating the failure of his good faith effort to secure

18

employment" once the burden shifts back to the employee. Id. at 264-65. Therefore, the ALJ's rejection of the third labor market study for failing to describe "the specific duties of the[] positions" demands more than we require. J.A. 33.

Further, Marine produced at least four alternative positions which the ALJ recognized would "accommodate [Fifer's] lifting restrictions." J.A. 33. Although "the employer need not contact prospective employers to inform them of the qualifications and limitations of the claimant," Universal Mar., 126 F.3d at 264, Sappington communicated Fifer's "physical limitations as [he] understood them" to the potential employers in order to determine whether the jobs were realistically available to Fifer, J.A. 168. Because Dr. Franchetti's lifting and sitting restrictions were the only restrictions of which Marine was aware prior to the hearing, and because Marine presented several suitable positions which the ALJ found comported with those restrictions, we conclude that the ALJ erred in finding that Marine failed to meet its burden under the Act.

Since Marine demonstrated the availability of suitable alternative employment which Fifer is capable of performing, the burden should have shifted to Fifer to prove he could not obtain more lucrative employment despite his diligent effort. We therefore vacate the final Decision and Order of the BRB, and

19

remand this matter for further proceedings consistent with this opinion.

## III.

For the foregoing reasons, Marine's petition for review is granted, the Decision and Order of the BRB is vacated, and the claim is remanded for further proceedings.

VACATED AND REMANDED

20